**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
WILLIAM JARRAD LITTLETON,                               :
                                                        :
                                    Plaintiff,          :       Index No.
                    v.                                  :
                                                        :
GOLDMAN SACHS GROUP, INC., RACHEL                       :       **COMPLAINT**
SCHNOLL, in her individual and professional capacities, :
and SIRION SKULPONE, in her individual and              :
professional capacities;                                :       **Jury Trial Demanded**
                                                        :
                                    Defendants.         :
------------------------------------------------------------------------x

Plaintiff William Jarrad Littleton hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      Defendant Goldman Sachs Group, Inc. ("Goldman" or the "Bank") fired Plaintiff

William Littleton – a Vice President, one of the Bank's most senior LGBTQ leaders and an eight

year veteran employee – directly after he complained to Employee Relations ("ER") that he had

been subjected to numerous incidents of homophobia and discrimination, including being

excluded from a client call because "***he sounded too gay***" and being asked "***What's wrong with***

***you? Do you act this way because you're gay?***"  Despite years of "Outstanding" performance

reviews filled with near-endless praise regarding Mr. Littleton's bright future at the Bank, he was

abruptly fired by those who he complained engaged in discriminatory conduct.

2.      Unfortunately, Mr. Littleton's termination at Goldman is not an isolated incident

or exception to the rule at the Bank or on Wall Street more broadly.  As stated in an Institutional

Investor article titled *Gay on Wall Street: An Investigation*, "[a] veil of vulnerability unifies

LGBT experiences in financial services, and sets the group apart from many straight

1

professionals."[1]  Wall Street has long been a place where people have been hesitant to openly express their sexual orientation for fear of backlash.  As stated in *Gay on Wall Street,* "Wall Street compels more covering from its employees than less conservative industries."

3.      Goldman attempts to hold itself out – presumably for public relations purposes – as creating an environment friendly to LGBTQ employees; the reality is that the Bank does little more than provide lip-service to LGBTQ diversity.  Although Goldman claims that the "crux of our efforts is a focus on cultivating and sustaining a diverse work environment and workforce, which is critical to meeting the unique needs of our diverse client base," as can be seen through the experiences of Mr. Littleton, the everyday reality does not measure up to this standard.

4.      For instance, on November 7, 2018, the Bank announced its partner class of 2018.[2]  The press release boasted that, at 26 percent female and six percent black, the 2018 partner class included its highest percentage of women and black partners to date.  Critically, this press release was completely silent on LGBTQ inclusion within this class.  The press release further states that only one percent of all Goldman partners (estimated at approximately five out of 500 people) identify as LGBTQ.  While it is easy to issue a general corporate statement of a commitment to diversity, Goldman has not demonstrated this commitment to the LGBTQ community in hiring, promotion and retention.

5.      Against this backdrop, it is not surprising that LGBTQ employees – like Mr. Littleton – are left in vulnerable situations without protection.  In fact, it stands to reason that a company with such poor LGBTQ diversity at senior levels would acquiesce to institutional discrimination, a lax response to LGBTQ discrimination complaints and retaliation against those

---

[1]   https://www.institutionalinvestor.com/article/b15yww7r3f1jpm/gay-on-wall-street
[2]   https://www.goldmansachs.com/media-relations/press-releases/partners-2018/

who raise complaints about this environment.  Unfortunately, it is evident that Mr. Littleton's experiences at Goldman are emblematic and a manifestation of larger institutional problems.

6.      Plaintiff seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), New York State Human Rights Law, N.Y. Executive Law §§ 290, *et seq.* ("NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL").

## ADMINISTRATIVE PREREQUISITES

7.      On June 5, 2019, Plaintiff filed a Complaint in New York State Supreme Court (the "State Court Action") alleging violations of the NYSHRL and the NYCHRL arising out of the same nucleus of operative facts.

8.      On June 27, 2019, Plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII.  The EEOC subsequently issued Plaintiff a Notice of Right to Sue ("Right to Sue"), received on January 16, 2020.

9.      On January 31, 2020, Plaintiff and Defendants executed and filed a stipulation of discontinuance without prejudice with respect to the State Court Action for the purpose of consolidating all claims in this action.  Plaintiff now files this Complaint within 90 days of the issuance of the Right to Sue.

10.     Plaintiff has complied with any and all other prerequisites to filing this action.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII.

3

The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and City law pursuant to 28 U.S.C. § 1367(a).

12.     Venue is proper in this County pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to this action, including employment practices alleged herein, occurred in this district.

## PARTIES

13.     Plaintiff William Jarrad Littleton is a resident of New York and is a former Vice President on the Specialty Solutions team within the Product Strategy Group at Goldman.  At all relevant times, Mr. Littleton met the definition of an "employee" under all applicable statutes.

14.     Defendant Goldman Sachs Group, Inc. is a corporation duly organized under the laws of the State of Delaware and is registered as a foreign business corporation in the State of New York.  At all relevant times, Goldman Sachs met the definition of an "employer" under all applicable statutes.

15.     Defendant Rachel Schnoll is a Managing Director and the Head of the U.S. Product Strategy Group at Goldman.  At all relevant times, Ms. Schnoll met the definition of an "employer" under all applicable statutes and exercised the authority to control Mr. Littleton's employment, including his work assignments, pay and responsibilities.

16.     Defendant Sirion Skulpone was the Head of the Specialty Solutions team within the U.S. Product Strategy Group.  After this complaint arose, she has since left this team and is now a member of the Goldman Sachs Asset Management Quantitative Investment Strategies ("QIS") group.  Ms. Skulpone now focuses on helping to sell the Goldman Sachs Tax Advantaged Core Strategies ("TACS"), managed by Monali Vora.  At all relevant times, Ms. Skulpone met the definition of an "employer" under all applicable statutes and exercised the

authority to control Mr. Littleton's employment, including his work assignments, pay and responsibilities.

## FACTUAL ALLEGATIONS

### I.    Mr. Littleton's Stellar Career at Goldman

17.    Mr. Littleton grew up in single-parent household and attended a public high school where he worked extremely hard to attend an elite college.  Upon his high school graduation in 2006, he was accepted by Amherst College with a full scholarship.

18.    In 2010, immediately after graduating from Amherst College with a Bachelor of Arts in Economics, Mr. Littleton started working at Goldman as an Analyst in the Market Risk Management & Analysis department where he quantified and analyzed the daily market risks of a $1.3 billion distressed credit hedge fund managed by Goldman Sachs.

19.    Mr. Littleton proceeded to steadily work his way up through the ranks at the Bank due to his outstanding performance, and in 2011, was asked to join the Market Risk Career Development Committee to plan the week long induction and training for new joiners of the division as well as facilitate communication across the organization regarding departmental initiatives.

20.    In 2012, after two years spent in Market Risk Management and Analysis, Mr. Littleton was offered a seat within the Consumer and Investment Management Division ("CIMD"), which is co-headed by Eric Lane and Tim O'Neill, specifically in the "Americas Client Business" (headed by Craig Russell), where he continued to thrive.

21.    As a result of his exemplary work, Mr. Littleton continued to receive promotions. In 2013, Mr. Littleton was promoted to Senior Analyst, and in 2014, he became an Associate. On

January 1, 2016, as soon as Mr. Littleton was eligible for his next promotion, he was made Vice President ("VP"); he was informed that he had been promoted when he was only 27 years old.

22.     Within the Americas Client Business, Mr. Littleton was on the Specialty Solutions team within the Product Strategy Group, where his team maintained product management responsibility for a $13 billion portfolio of cross-asset alternative investment strategies.

23.     Mr. Littleton acted as a client-facing product specialist who partnered with Goldman's relationship managers to deliver investment solutions to external financial intermediary clients (broker/dealers and registered investment advisors) as well as select institutions to raise capital in unconventional products such as quantitative option overlay funds (the Goldman Sachs U.S. Equity Dividend & Premium Fund, ticker: GSPKX) and liquid hedge fund strategies (the Goldman Sachs Absolute Return Tracker Fund, ticker: GJRTX).

24.     In 2016, Mr. Littleton was asked to take on the additional responsibility of joining a select group of people to help with the supervisory of options-related strategies and communications for the Americas Client Business and formally became a FINRA Registered Option Principal for Goldman in October of that same year.  Mr. Littleton's extreme attention to detail meant he often caught inadvertent errors and misrepresentations made by his colleagues, including Ms. Skulpone, ahead of dissemination to clients.

25.     Mr. Littleton was directly involved in client meetings, sales pitches, asset defense engagements and training colleagues to drive product adoption.  Mr. Littleton also developed and authored numerous technical white papers and client-approved capital markets commentaries to identify tactical investment and implementation opportunities for institutional clients globally.

26.     These efforts served to drive client adoption and usage of Goldman's ActiveBeta and Fixed Income Exchange Traded Funds (including, but not limited to tickers: GSLC, GEM, GSIE, GSJY, GVIP, GBIL).  In fact, in 2016 Goldman Sachs won the Best ETF Issuer Capital Markets Desk Award from ETF.com, which is led by Steve Sachs.  The firm's global head of ETFs, Mike Crinieri, acknowledged via email to Ms. Schnoll that Mr. Littleton had played a key role in helping the franchise to secure this award.

27.     Notably, in 2018 while Ms. Skulpone was out of the office on maternity leave, Mr. Littleton's efforts partnering with individuals across the organization as the product manager for the Goldman Absolute Return Tracker Fund resulted in a $1 billion asset raise for the product over the year.  In 2018 alone, the firm realized $12.2 million in gross revenues from this product, which was only one of the numerous strategies that Mr. Littleton covered and delivered to clients on behalf of Goldman.  Mr. Littleton was also asked by members of the sales force to cover additional products to help drive business, which Ms. Schnoll would not allow him to do when he made her aware of this request.

28.     During Mr. Littleton's career, Goldman has used a performance review process which includes 360-degree developmental feedback from approximately eight colleagues across levels of seniority and business units, which are then aggregated, edited, selectively deleted and paraphrased by the employee's supervisors who are given complete and subjective discretion to assign an "overall manager rating" to the employee, as well as to write a final qualitative review summary, which is what is provided to the employee by the supervisor(s).

29.     The employee's managers then stack rank all of the members in their respective groups based on their personal judgement of each employee's performance relative to their peers in the group.  Based on these numerical rankings, the employees are assigned performance

7

"quartiles" (1st quartile being the "best" and 4th quartile being the "worst") at the managers'
discretion.  The "quartile" assigned is the primary factor which determines each employee's
annual compensation, opportunities for promotion and eligibility for internal transfer.

30.     Throughout his employment, Mr. Littleton's performance reviews have been
nothing short of spectacular.  In 2014, when Mr. Littleton was a first-year Associate, Ms.
Skulpone assigned him an "Above Expectations" overall rating and wrote in his review summary
stating:

> "Will is a highly productive, proactive and impactful member of
> the team, and in many ways he is performing at a level beyond his
> years"

> "Will also constantly delivers high quality work product.  It is
> evident he takes tremendous pride in his work, paying close
> attention to in terms of analytics as well as aesthetics"

> "In fact, I'm constantly impressed with his analytical ability and
> critical thinking skills and I feel like he's taught me many things
> since we've been working together"

> "Overall, I feel very lucky to have Will on my team.  He is so
> productive and effective, and he pushes me in a positive way to be
> better at my job and increase my understanding.  I rely on him a
> lot, really believe in him and think TPD  has [sic] benefitted from
> his work."

31.     In 2015, Mr. Littleton's "Above Expectations" rating was repeated, and further
bolstered by numerous substantive remarks:

> "Will is an incredibly valuable resource to our team . . . Will's
> significant technical expertise is one of his greatest strengths, and
> there is a high degree of confidence across the floor regarding his
> subject matter expertise.  His transition into a more client-facing
> role has been smooth, and he has received positive feedback"

> "Will has demonstrated strong ability to come up to speed quickly
> on products he's never covered before and speak to them credibly
> and effectively"

> "[H]e is incredibly talented, has high energy, is commercial and really cares about his work product"
>
> "Will is a great communicator, a great presenter and just a joy to work with.  He has a passion and enthusiasm that contributes to our team's commercial spirit"
>
> "He embodies the culture at GS – hard working, motivated, creative, and enthusiastic . . . consistently delivers high quality work product"
>
> "[I]t is evident he takes tremendous pride in his work, paying close attention to detail in terms of analytics as well as aesthetics"
>
> "Will is a culture carrier, often going above and beyond when it comes to mentoring and diversity."

32.    In 2016, Ms. Skulpone improved Mr. Littleton's rating to "Outstanding."

Building off Mr. Littleton's previous reviews, his 2016 review stated:

> "Will continues to demonstrate technical excellence, with almost unparalleled attention to detail.  Always exhaustive in his analyses. Works with a pace that few others can match.  Will has outstanding technical depth and yet continues to broaden and deepen his knowledge which makes him even more effective"
>
> "Will has made significant commercial contributions and was a key driver of top initiatives for our team"
>
> "Will was instrumental in multiple wins in my territory"
>
> "Not only is Will thoughtful in developing materials, he is eager to receive and incorporate feedback.  I enjoy his enthusiastic presentations – they show his passion about the job and add to the diversity of presentation styles"
>
> "Will has consistently demonstrated true dedication to cultivating the next generation of talent. . .Will continues to make leaps and bounds in his development every year."

33.    In 2017, Mr. Littleton's success continued – 87 percent of the feedback Mr.

Littleton received rated him as "Outstanding," and he received "Outstanding" scores in all

subcategories of the review including Risk Management, Reputation, Culture and Compliance

Conduct.  Mr. Littleton's colleagues provided overwhelming praise regarding his work:

> "[Will] has established himself as the go to and subject matter expert on options and derivatives and is a great asset and resource to the team and broader organization.  Additionally, Will continues to invest a tremendous amount of time and effort into developing new talent"

> "He is truly the perfect mix of someone who has a high level of technical expertise and is relationship oriented which is evidence by the direct sales he has been able to generate in the field."

> "Will is an outstanding strategic thinker.  He thin[k]s holistically about the TPD business and finds opportunities to deliver commercial results."

> "He excels in front of clients.  He is always well prepared, technically strong, and clearly communicates ideas centered on the client's sophistication."

> "Will is an asset to GS.  He is always eager and willing to help out the RC's and RD's with their needs and goes above and beyond to help us bring in business.  He has a great disposition and is a pleasure to work with."

> "Will is constantly thinking of ways to develop ideas into content and get that content in front of the sales teams and clients. His deep knowledge of products and markets translates effectively into commercial opportunities."

34.     In short, throughout his first seven years at Goldman, Mr. Littleton was a model

employee.  Clearly, Mr. Littleton's colleagues and managers valued him as a motivated, talented

and committed team member who produced high-level work product and was a rising star.

## II.     Mr. Littleton's Role as an LGBTQ Leader at Goldman

35.     As noted throughout his evaluations, Mr. Littleton was a champion for those who

he worked with, those who reported to him, his numerous mentees and was a strong advocate for

diversity and inclusion during his career at Goldman.

36.     From the start, Mr. Littleton was integrally involved in Goldman's "LGBT Network" and often invited his team to LGBTQ panels, educational sessions and social networking events.  In 2012, when he was still an Analyst, Mr. Littleton was invited to join a small group of employees focused on planning and organizing the firm's LGBTQ Leadership conference.  Mr. Littleton's commitment and passion for diversity as well as his thoughtful execution of this initiative did not go unnoticed to the senior members of the firm's LGBT Network Steering Committee.

37.     Goldman's LGBT Network has a steering committee that is divided into approximately a dozen "pillars," covering different divisions and aspects of the Network's missions.  In 2014, Mr. Littleton became the Head of the LGBT Network's Analyst and Associate Engagement Pillar, a position he maintained through 2016.  In this role, Mr. Littleton was responsible for cultivating a sense of community for junior LGBTQ members of the firm as well as summer interns.  He coordinated and hosted numerous events to welcome them to the firm and introduce them to senior members of the LGBT Network.

38.     Mr. Littleton became the Co-Head of the LGBT Network's Ally Pillar, which helps drive inclusion, education and engagement of non-LGBTQ (i.e. Ally) members of the firm, a position Mr. Littleton held until he was fired.

39.     Mr. Littleton was also the Co-Head of the Consumer & Investment Management Division's LGBT Network, a position he and his Co-Head fought to create and which he also held until his termination.  Prior to Mr. Littleton's involvement, Goldman's Human Capital Management Division refused to recognize the division's LGBT individuals as a formal network. The implication of this was that the firm would not allocate adequate resources or budget for divisional LGBTQ events or educational sessions without the formal "network" designation.

40.     In this position, Mr. Littleton and his Co-Head championed the group's formal recognition as a "network" and built out a team to help with divisional LGBT initiatives. Notable accomplishments of this group included bolstering LGBTQ recruiting efforts, working with members of the business to identify ways in which partnering with LGBTQ clients could drive positive commercial impact for the division (which included Mr. Littleton presenting on behalf of Goldman at a Pride Month conference for one of the firm's key clients) and driving visibility and leadership opportunities for LGBTQ members of the division.  In 2016, Goldman nominated Mr. Littleton as part of a small group of Bank representatives to the OutNEXT: LGBT Emerging Leader Summit, an honor which is reserved exclusively for up-and-coming notable young professionals in the law and finance industries.  Each participating firm is allowed to send only three to five people per year and selected individuals represent the talent that each respective firm has identified as their future leaders.

41.     In short, Mr. Littleton was one of the most proud, active and vocal LGBTQ leaders at Goldman throughout his tenure.

## III.    Mr. Littleton Experiences Homophobic Discriminatory Conduct at Goldman

42.     Mr. Littleton was well aware that being openly gay at a financial institution could lead to discrimination and ridicule.

43.     For instance, but only by way of example, in March 2014, Mr. Littleton was scheduled to be included in a quantitative equity strategy product pitch conference call with a client.  On the day of the call and without justification or reason, the call's moderator spoke with Mr. Littleton and told him not to dial in.

44.     Later, a colleague of Mr. Littleton's who had a relationship with the moderator of the call told Mr. Littleton that the moderator said he should be dropped from the call because ***"he***

*sounds too gay."* This is entirely consistent with the proposition espoused in *Gay on Wall Street* that "Wall Street compels more covering from its employees than less conservative industries."

45.     Mr. Littleton was understandably shocked and hurt, and he reached out to his supervisor, Ms. Skulpone, as soon as he was made aware of the offensive comment and discriminatory conduct.  Ms. Skulpone, who was on maternity leave at the time, provided no support other than to say, in sum and substance: *"That sucks."*

46.     When Ms. Skulpone returned from leave several months later, she mentioned the incident in passing to her supervisor, Ms. Schnoll.  After this, Ms. Skulpone informed Mr. Littleton that she was going to report the incident to Employee Relations because it would "look bad if she did not do something" (that is, for her own benefit and not out of any genuine sense of ethical obligation).

47.     Leslie Reider from ER later contacted Mr. Littleton and asked if he wanted to take any further action.  Mr. Littleton, out of a fear of retaliation and due to ER's reputation for taking little action to support employees, said he did not.  Ms. Reider did not make any effort to further investigate a facially discriminatory incident aside from a follow up email to Mr. Littleton, making her goal of closing out and suppressing this situation fully transparent.

48.     Thus, Mr. Littleton quickly learned not only that homophobia was permitted at the Bank, but also that ER complaints were not taken seriously.

49.     Another example occurred in June 2015, when Mr. Littleton was out of office on the Monday after the LGBT Pride parade in New York City.  Mr. Littleton had informed Ms. Skulpone that he would be absent on that day.  In a team meeting on that Monday, Ms. Schnoll, to whom Mr. Littleton also reported, said to the team: *"Oh, Will's not in? He must be hungover from pride festivities."*

50.     Mr. Littleton heard about this comment from his colleagues and was humiliated and offended that Ms. Schnoll falsely attributed his personal time out of the office in these terms, crystallizing her lack of acceptance to all those present at the meeting.  Of course, if a heterosexual employee were off on the day following the LGBT Pride parade, that person would not have been the subject of ridicule.

51.     As another example, in May 2016, Mr. Littleton's sexual orientation became a subject of office fodder once again.  Ms. Skulpone, seeking to impress a partner (Gary Chropuvka), provided certain non-finalized figures and data to that partner regarding the asset ownership levels for Goldman's U.S. Equity Dividend & Premium Fund (ticker: GSPKX) product on their platform.

52.     In short, Ms. Skulpone conveyed that shifting asset ownership levels meant their group had more control over the operation of this product from an investor relations perspective than did other divisions within the Bank, notably Goldman Private Wealth Management.  This had been based on information Mr. Littleton had conveyed to Ms. Skulpone in what he expressly stated was unfinished form.

53.     While Mr. Littleton did not take issue with Ms. Skulpone attempting to take credit for his research and findings, he was concerned that it was improper to make representations that were potentially inaccurate, and he let her know.  In response, Ms. Skulpone expressed displeasure with Mr. Littleton's remarks.

54.     Over the next several days, there was some tension between them where she refused to speak to Mr. Littleton and ignored him.  In a catchup meeting shortly thereafter, Mr. Littleton attempted to clear the air and stated that he had not been trying to "give her a hard

time" over the data and was only well-intentioned.  Ms. Skulpone, evidently still disgruntled, asked him: "***What's wrong with you? Do you act this way because you're gay?***"

55.     Naturally, Mr. Littleton was shocked by this disturbing comment, but decided not to report it to ER because he was concerned about retaliation and his lack of trust in ER's legitimacy based in part on his last interaction with Ms. Reider regarding discrimination in the workplace.  Mr. Littleton was also concerned he could be branded as a "problem employee" and that reporting this could hurt his career path.

56.     Furthermore, on May 4, 2018, Mr. Littleton walked into a meeting, dressed as he dressed every single day: in a button-down business shirt tucked into dress slacks.  Unprompted, Ms. Schnoll looked Mr. Littleton up-and-down and said:  "***You look <u>so</u> Miami today,***" a thinly veiled alternative to simply telling Mr. Littleton that he "looked like a gay Latino."  Ms. Schnoll's words were a verbal attack targeted directly at the intersection of Mr. Littleton's ethnicity and his LGBTQ identity.

57.     To make matters worse, Mr. Littleton's compensation, which was in large part determined by Ms. Skulpone and Ms. Schnoll through Goldman's annual review and quartiling process, had not only stagnated, but had decreased in recent years despite his promotions, increasing leadership responsibility at the firm and proven record of continued revenue generation for the firm.

58.     After Mr. Littleton's complaint of discrimination, his annual compensation had fallen by nearly 20 percent, while other VPs were earning considerably more.  Mr. Littleton believed that Ms. Schnoll was purposely allocating bonus dollars away from him as a result of her discriminatory feelings towards him.

**IV.**     **Mr. Littleton Raises Complaints Concerning Discriminatory Conduct**

59.     On May 18, 2018, Mr. Littleton met with one of his LGBT Network mentors, Jen Barbetta, a former Partner who helped lead the Global Portfolio Solutions Group within the Consumer & Investment Management Division. During this meeting Mr. Littleton voiced his frustrations with his supervisors, including that he felt he was being continuously mistreated due to his LGBT status.

60.     Ms. Barbetta, an LGBT Network leader and advocate for diversity and inclusion, was alarmed by Mr. Littleton's complaints and urged him to meet with ER as soon as possible. Moreover, Ms. Barbetta informed Mr. Littleton that she would be speaking to Ms. Reider about his concerns on her own that same day.

61.     Notwithstanding Mr. Littleton's earlier trepidation, he decided to take Ms. Barbetta's advice. On May 25, 2018, Mr. Littleton met with Ms. Reider in ER.

62.     Mr. Littleton told Ms. Reider about his supervisors' conduct, that he felt discriminated against on the basis of his sexual orientation, was subject to a hostile work environment and was marginalized by the leadership on his team. Mr. Littleton discussed the specific incidents detailed above, and also explained that he felt he was being passed over for opportunities in favor of less qualified colleagues.

63.     Ms. Reider advised Mr. Littleton that she would speak to his supervisors, investigate the situation and get back in touch with him. Over the following several weeks, Ms. Reider met with and had group phone conversations with Ms. Schnoll and Ms. Skulpone.

64.     In mid-June 2018, Ms. Reider met with Mr. Littleton again and told him that his managers – not surprisingly – denied ever making any comments about his sexual orientation,

and that the "you look so Miami" comment had been a compliment because he "looked so tan and so great."

65.     With Mr. Littleton's supervisors' denials in-hand, Ms. Reider had what she needed to declare the allegations unsubstantiated and close the matter without repercussion to the harassers.  Ms. Reider informed Mr. Littleton that she deemed the issue resolved – despite her complete inaction – and made it clear to Mr. Littleton that there was nothing more she could do to help.

66.     Thereafter, Mr. Littleton was marginalized by Ms. Schnoll and she told him that he should look for opportunities in other groups at Goldman, despite her and Ms. Skulpone previously giving him an endless array of glowing comments and scores on his performance reviews.  Ms. Schnoll was clearly hoping to "push out" an employee who had raised complaints of discrimination

**V.     <u>Retaliation Against Mr. Littleton for His Complaints of Discrimination</u>**

67.     On November 9, 2018, Mr. Littleton had his annual evaluation.  Given that the review is based on 360-degree feedback, the scores remained overwhelmingly positive yet again, with Mr. Littleton achieving a score of 87% "Outstanding" across his eight feedback providers who ranged in seniority from Analyst to Managing Director – an impressive feat especially in the face of the adversity he was subjected to from his direct supervisors.

68.     Mr. Littleton's review notes that his peers continued to have the same opinions of him and his work as year prior, including comments such as:

> "Will is highly motivated and driven.  He has produced top notch pieces for the ETF team"

> "Will [i]s a subject matter expert when preparing themselves for client conversations."

"[H]e has an extremely high level of commercial effectiveness
[and is] extremely knowledgeable in specialty products."
"Will has been a phenomenal leader of the LGBT network.  He has
built key relationships across the firm and been a huge advocate
and mentor for others at the firm"

69.     This praise was plainly consistent with Mr. Littleton's numerous previous

performance reviews.

70.     However, in 2018, there was a change.

71.     After many years of positive reviews, directly after Mr. Littleton had filed a

discrimination complaint, Ms. Schnoll and Ms. Skulpone included significant unwarranted

criticism in his review.

72.     Ms. Schnoll and Ms. Skulpone stated that "Will's performance has been

inconsistent" and that "over the past year and in years prior, his focus and commitment has

noticeably waxed and waned."

73.     None of these non-descript, undetailed, supposed "issues" had ever been raised

directly with Mr. Littleton before, let alone in any formal manner.   Moreover, despite Ms.

Schnoll and Ms. Skulpone's reference to problems "in years prior," Mr. Littleton's previous

reviews do not reflect these supposed performance problems, demonstrating that this was a

belated attempt to create a paper trail to justify his termination.

74.     Notably, Ms. Schnoll and Ms. Skulpone also stated that Mr. Littleton's "judgment

and communication have also resulted in personality conflicts that have occurred with

concerning frequency."  Remarkably, the only potential "personality conflicts" – to the extent

they can be called that – were Mr. Littleton's complaints of discrimination by Ms. Schnoll and

Ms. Skulpone.

75.     At the end of this in-person review, Ms. Schnoll and Ms. Skulpone told Mr. Littleton that he was being fired due to "performance issues" that "manifested this year" and that his last day at the Bank would be January 31, 2019.

76.     Mr. Littleton was never previously informed about any supposed issues with his performance in any review or in any other disciplinary document whatsoever, and his eight-year tenure at the Bank abruptly came to an end without prior notice.

77.     In fact and based on FINRA reports, Goldman had already filed an "Administrative Termination" for his Registered Options Principal designation with the New York Stock Exchange ("NYSE") and its various sub-entities, showing that his employment had been terminated as early as September 30, 2018, only weeks after the supposed ER investigation into Mr. Littleton's discrimination complaints – however, that termination was withheld from him until his performance review to make it appear as a "performance problem."

78.     In short, Mr. Littleton was retaliated against for finally having the courage to pursue his complaints of discrimination internally with Goldman's ER.

## VI.    Goldman's Meager Attempt at LGBT Inclusion and Pay Equity

79.     In the days following notice of Mr. Littleton's termination, he met with Martin Chavez, the former Chief Financial Officer and current Global Co-Head of the Securities Division.  Mr. Chavez – who is openly gay – and Mr. Littleton had an ongoing mentorship throughout Mr. Littleton's time at Goldman, which started during Mr. Littleton's Analyst years.

80.     During this meeting, Mr. Littleton described the discrimination and retaliation he had been subjected to in detail, to which Mr. Chavez responded, "I am so sorry, Will."  Mr. Chavez then continued to apologize for Mr. Littleton's forced departure, repeating that same

statement over and over again, and told Mr. Littleton about his own personal experience with homophobia and discrimination when he was promoted to the Management Committee.

81.     As Mr. Chavez described to Mr. Littleton, upon the announcement of his promotion, Mr. Chavez received a call from another partner who said, "I guess they needed a gay Latino on the Management Committee."  Mr. Chavez made it clear that Mr. Littleton was not alone in suffering discrimination at the firm.

82.     This is consistent with Mr. Chavez's comments to the New York Times in a 2016 bio-piece called *A Gay, Latino Partner Tests Goldman's Button-Down Culture* in which he noted Goldman's "lack of diversity" and the need to "take Goldman to a different place."[3]

83.     Although Goldman claims that the "crux of our efforts is a focus on cultivating and sustaining a diverse work environment and workforce, which is critical to meeting the unique needs of our diverse client base," as can be seen through the experiences of Mr. Littleton and Mr. Chavez, the everyday reality does not measure up to this standard.

84.     For instance, on November 7, 2018, the Bank announced its partner class of 2018. The press release boasted that, at 26 percent female and six percent black, the 2018 partner class included its highest percentage of women and black partners to date.

85.     Critically, this press release was completely silent on LGBT inclusion within this class.  The press release further states that only one percent of all Goldman partners (estimated at approximately five out of 500 people) identify as LGBT.

86.     Indeed, in Goldman's Affinity Network Survey 2018 for various firm wide affinity networks, the co-heads of the LGBT Network point out that "differently from other

---

[3]     https://www.nytimes.com/2016/04/03/business/dealbook/goldmans-tech-chief-pushes-the-bank-to-be-more-open-like-him.html

[affinity] networks, there are no formal initiatives driving management accountability, enhancing connectivity and advocacy for our LGBT employees."

87.     Moreover, Goldman faces major problems with respect to pay equity, further demonstrating a lack of commitment to anti-discrimination initiatives.  According to the Second Annual Gender Pay Scorecard ("GPS") published by Natasha Lamb (a Managing Director at Arjuna Capital) and Michael Passoff (CEO of Proxy Impact)[4], Goldman received an "**F**" score and lags well behind many other international corporations.

88.     The GPS compiled data on numerous companies across the finance, information technology, retail and healthcare industries regarding their pay equity disclosures in light of the fact that corporations have come under intense pressure to close discriminatory pay gaps in recent years.

89.     The GPS grades the companies across five categories: (1) Adjusted, "Equal Pay" Gap; (2) Unadjusted, Median Pay Gap; (3) Racial Pay Gap; (4) Coverage; (5) Commitment.  The below chart reflects the aggregate grades distributed:

---

[4]     https://arjuna-capital.com/wp-content/uploads/2019/04/Gender-Pay-Scorecard-2019-2.pdf

| ARJUNA CAPITAL / PROXY IMPACT GENDER PAY SCORECARD | |
|---|---|
| COMPANY | GRADE |
| Citigroup | A |
| Apple | B |
| Pfizer | B |
| Nike | B |
| Bank of New York Mellon | B |
| Starbucks | B |
| JP Morgan | B |
| Intel | B |
| Wells Fargo | B |
| American Express | B |
| Bank of America | C |
| Alphabet | C |
| Expedia | C |
| Facebook | C |
| Mastercard | C |
| Progressive Insurance | C |
| Amazon | C |
| Reinsurance Group | C |
| eBay | C |
| Texas Instruments | C |
| Microsoft | C |
| Adobe | C |
| Costco | D |
| Marriot | F |
| McDonald's | F |
| Walmart | F |
| TJX Companies | F |
| Cigna | F |
| Oracle | F |
| Hewlett Packard | F |
| Metlife | F |
| Arthur J. Gallagher | F |
| Goldman Sachs | F |

90.     The GPS report further substantiates that Goldman does not prioritize equal and non-discriminatory treatment of its employees, and Mr. Littleton's experience of discrimination and retaliation is not an exception to the rule.

91.     A 2018 Human Rights Campaign study[5] found that only slightly more than half of LGBTQ workers feel comfortable being out at work, which is roughly the same number as a decade ago.  This statistic calls into questions how corporate diversity initiatives are actually working.

---

[5]     https://assets2.hrc.org/files/assets/resources/AWorkplaceDivided-2018.pdf?_ga=2.96277980.1516616067.1558388474-748924942.1558388474

92.     The same study also found that one in five LGBTQ workers have been told or had a coworker imply that they need to dress more feminine or masculine.  Similarly, this study also found that 53 percent of LGBTQ workers report hearing jokes about lesbian or gay people at least once in a while at work.

93.     Against this backdrop, it is not surprising that LGBTQ employees – like Mr. Littleton – are left in vulnerable situations without protection.  The episodic, explicit instances of discrimination mentioned above were only exacerbated by the constant implicit discrimination Mr. Littleton faced, which became a daily drill that punctuated his life and career at Goldman.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of Title VII)
### *Against Defendant Goldman*

94.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

95.     By the actions described above, among others, Defendant Bank discriminated against Plaintiff on the basis of his sexual orientation in violation of Title VII by denying him equal terms and conditions of employment, including, but not limited to, denying him the opportunity to work in an employment setting free of unlawful discrimination and harassment, denying him equal pay to his peers and equal advancement opportunities, and ultimately terminating his employment.

96.     As a direct and proximate result of Defendant Bank's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of damages, to the greatest extent permitted under law.

97.     As a direct and proximate result of Defendant Bank's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title VII)
#### *Against Defendant Goldman*

98.     Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

99.     By the actions described above, among others, Defendant Bank retaliated against Plaintiff on the basis of his protected activities in violation of Title VII by, *inter alia*, terminating Plaintiff's employment.

100.     As a direct and proximate result of Defendant Bank's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled an award of monetary damages and other relief.

101.     As a direct and proximate result of Defendant Bank's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
#### *Against All Defendants*

102.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

103.     By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of his sexual orientation in violation of the NYSHRL by denying

him equal terms and conditions of employment, including, but not limited to, denying him the opportunity to work in an employment setting free of unlawful discrimination and harassment, denying him equal pay to his peers and equal advancement opportunities, and ultimately terminating his employment.

104.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of damages, to the greatest extent permitted under law.

105.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief.

### FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

106.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

107.    By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of his protected activities in violation of the NYSHRL by, *inter alia*, terminating Plaintiff's employment.

108.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled an award of monetary damages and other relief.

109.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

**FIFTH CAUSE OF ACTION**
**(Aiding and Abetting Discrimination under the NYSHRL)**
***Against Defendants Skulpone and Schnoll***

110.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

111.     Defendants Skulpone and Schnoll knowingly or recklessly aided and abetted the unlawful employment practices and discrimination against Plaintiff in violation of the NYSHRL.

112.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

113.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering for which he is entitled to an award of compensatory damages and other relief.

**SIXTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
***Against All Defendants***

114.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

115.    By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of his sexual orientation in violation of the NYCHRL by denying him equal terms and conditions of employment, including, but not limited to, denying him the opportunity to work in an employment setting free of unlawful discrimination and harassment, denying him equal pay to his peers and equal advancement opportunities, and ultimately terminating his employment.

116.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

117.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

118.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
***Against All Defendants***

119.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

120.    By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of his protected activities in violation of the NYCHRL by, including, but not limited to, terminating Plaintiff's employment.

121.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

122.     As a direct and proximate result of Defendants' unlawful discriminatory and retaliatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

123.     Defendants' unlawful discriminatory and retaliatory actions constitute malicious, willful and wanton violations of NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

### EIGHTH CAUSE OF ACTION
**(Aiding and Abetting Discrimination under the NYCHRL)**
***Against Defendants Skulpone and Schnoll***

124.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

125.     Defendants Skulpone and Schnoll knowingly or recklessly aided and abetted the unlawful employment practices and discrimination against Plaintiff in violation of the NYCHRL.

126.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

127.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence,

emotional pain and suffering for which he is entitled to an award of compensatory damages and other relief.

128.     Defendants Skulpone and Schnoll's unlawful discriminatory and retaliatory actions constitute malicious, willful and wanton violations of NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.     An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.     An award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.     An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his emotional distress;

E.     An award of punitive damages against Defendants, in an amount to be determined at trial;

F.     Prejudgment interest on all amounts due;

G.     An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

H.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: February 4, 2020
       New York, New York                    Respectfully submitted,

                                             **WIGDOR LLP**

                                             By: _____
                                                    David E. Gottlieb
                                                    Julia Elmaleh-Sachs

                                             85 Fifth Avenue
                                             New York, NY 10003
                                             Telephone:  (212) 257-6800
                                             Facsimile:   (212) 257-6845
                                             dgottlieb@wigdorlaw.com
                                             jelmaleh-sachs@wigdorlaw.com

                                             *Counsel for Plaintiff*